IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION

TIA ANISTON MARQUEZ,

    Plaintiff,

v.                                     CASE NO. 5:12-cv-125-RS-EMT

MEDIACOM COMMUNICATIONS
CORPORATION,

    Defendant.

_____/

# ORDER

Before me are Defendant's Motion for Summary Judgment (Doc. 36) and Plaintiff's Response (Doc. 53).

## I. STANDARD OF REVIEW

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S. Ct. 2505, 2512 (1986). The moving party has the burden of showing the absence of a genuine issue as to any material fact, and in deciding whether the movant has met this burden, the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

1

Thus, if reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment. *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)). However, a mere 'scintilla' of evidence supporting the nonmoving party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party. *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 251).

## II. BACKGROUND

I accept the facts in the light most favorable to Plaintiff. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002)). " 'All reasonable doubts about the facts should be resolved in favor of the non-movant.' " *Id.* (quoting *Burton v. City of Belle Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999); *Clemons v. Dougherty County*, 684 F.2d 1365, 1368-69 (11th Cir. 1982).

Plaintiff began working for Mediacom Communications Corporation ("Mediacom") on May 10, 2010, as a customer service representative in Mediacom's Southport office in Panama City, Florida. Plaintiff's immediate supervisors were June Gregg, stationed in Alabama, and Sanda "Sam" Simpson, stationed in Pensacola, Florida. (Doc. 55-1).

The Southport office is a small, two-story building, with the customer service desk, kiosk, and inventory for various cable and internet devices on the first floor and two offices and a conference room on the second floor. Plaintiff's basic job duties included: assisting customers with billing, services, and products; maintaining equipment inventory; issuing equipment to field technicians; and processing customer payments and verify daily intake of all monies received and posted on site as well as in the field. *Id.* Technicians would typically return or obtain necessary equipment in the morning then leave the Southport office to conduct installations or repairs without returning until the next morning. Therefore, Plaintiff was regularly alone in the building. *Id.*

Plaintiff underwent six weeks of training, but claims that a field technician, Mark Arnold, began sexually harassing her on a regular basis once her trainers left. *Id.* During training, Plaintiff signed Defendant's sexual harassment policy which states that employees "should immediately report to his or her supervisor" or "should inform another supervisor" of any conduct that violates the policy. (Doc. 55-9). Plaintiff alleges that Arnold began to sexually harass her in August 2010 by lingering at the counter and looking over the counter at her breasts; however, when she first complained to her supervisor about his behavior, she did not mention anything about sexual harassment. (Doc. 55-1). The following is a portion of Plaintiff's deposition:

> Q: So in the beginning, when you first complained to [Kissam], you weren't complaining about sexual harassment; is that correct?
> A: I was complaining that he was loitering around the office, standing in front of me.
> Q: Okay.
> A: Standing in front of me, on top of me.
> Q: Yeah. Violating your personal space?
> A: Correct.
> Q: Okay. Did you once say to [Kissam] he's sexually harassing me in that first instance?
> A: No, I did not tell him that he was sexually harassing me.
> Q: Because he was not. He was just standing around and violating your personal space, right?
> A: Yes.
> Q: You didn't consider him to be sexually harassing you?
> A: That is correct at the time.

(Doc. 41-1, p. 127-28).

Arnold's behavior improved until November 2010, when his offensive behavior continued. Plaintiff also alleges that at some point Arnold spoke about wanting to take her on his motorcycle so he could feel Plaintiff's arms around him. (Doc. 55-1). There is a discrepancy between Plaintiff's affidavit (Doc. 55-1) and her deposition testimony (Doc. 41-1) about when Arnold began looking down her shirt. In the affidavit, she alleges that he began looking down her blouse in August 2010 (Doc. 55-1, ¶ 9); however, she testified that he didn't start looking down her blouse until January 2011.

> Q: I want to know when it became sexual.
> A: It became sexual when he'd actually look over the counter and down my top when I told him to move.
> Q: Okay. And when did that start?
> A: Okay. That started probably the first of the year in 2011.

4

> Q: So January 2011, it changed and he started looking down [your top]?
> A: Yes.

(Doc. 44-1, p. 128-29). Although she spoke to Kissam once again about Arnold's behavior, she did not tell him that Arnold was doing anything sexual in nature. *Id.* at 133 ("No, I did not tell [Kissam] anything about a sexual nature at this time, but I knew he was sexually harassing me because after I moved the computer from one end of the counter to the other end of the counter, that is when he started leaning over.").

On March 15, 2011, Plaintiff emailed Kissam asking him to speak to Arnold about standing in front of her at the counter. (Doc. 55-12). After Kissam spoke to Arnold, Plaintiff replied with another email that stated, "I need to wear a turtle neck to work from now on!" *Id.* This is the first time that Kissam was made aware that Arnold was looking down Plaintiff's blouse.

Later that day, Plaintiff testified that Arnold kept reaching over her to access a drawer where the technicians' supplies were located. (Doc. 44-1, p. 137). Plaintiff claims that Arnold "brushed, grabbed, touched" her breast when he was in the process of grabbing a paperclip. *Id.* Although other technicians were in the area, none claimed to have seen the incident. (Doc. 55-1). Plaintiff called Kissam, but when he didn't answer, she called Gregg. Plaintiff said that the first thing Gregg asked when she told her about the incident was whether "he was hot." (Doc.

5

55-1). Gregg assured her that she would look into the situation and report it to human resources. *Id.*

On April 28, 2011, Plaintiff was alone in the office. She claims that Arnold kept moving closer to her although she told him multiple times to go downstairs. She was scared for her safety and grabbed a pair of scissors in the event she had to defend herself and places her hand on the panic button. *Id.* At that moment, Arnold received a phone call and left. *Id.* Plaintiff went to the bathroom to vomit and cry, and then she emailed Defendant's Human Resources ("HR") Department to file a complaint. (Doc. 55-13).

Plaintiff then received a phone call from Sonja Hudson and Lydia Smith, who work in the HR Department. They said that they had not received any complaints regarding Arnold. (Doc. 55-1). Smith went to the Southport office to interview Plaintiff later that day. *Id.* Following the interviews, Arnold was transferred to another work site. (Doc. 55-4, p. 9-10).

On May 1, 2011, Plaintiff was reprimanded for locking a customer out of the Southport office. (Doc. 44-1, p. 75). Plaintiff told Simpson that the reason she got panicked and locked the customer out was because Arnold was harassing her the week before. *Id.*

On May 3, 2011, Plaintiff went to a scheduled appointment with her physician, who prescribed anti-anxiety and anti-depressant medication and ordered

her not to work for three days, because Plaintiff felt nauseous and had headaches since the April 28th incident. (Doc. 55-1).

On June 7, 2011, Plaintiff was involved in a car accident in the parking lot of the Southport office. She claims the accident happened because she panicked after believing she had seen Arnold's van parked in the lot. (Doc. 44-1, p. 115). A few days before the accident, Plaintiff overheard Arnold on the radio with another technician, Daryl Lee, discussing coming back to the Southport office to pick up paperwork. *Id.* at 116-17. Because Plaintiff believed the van she saw was Arnold's, she slammed on the brakes, put her car in reverse, and hit another vehicle. (Doc. 55-1).

After the accident, Plaintiff went to the emergency room and obtained a note excusing her from work for three days. June 7th was Plaintiff's last day of work at Mediacom. She took a leave of absence from June 7th until February 8, 2012, while being seen by a mental health counselor. *Id.* She received a paycheck from Mediacom until her vacation and sick days were exhausted. (Doc. 44-1, p. 77-78).

Plaintiff filed a Charge of Discrimination with the EEOC on June 27, 2011, alleging sexual harassment.

On November 17, 2011, Plaintiff's therapist wrote a letter to Defendant's HR Manager, Belinda Maldonado, informing her that Plaintiff could resume work, with the caveat that she could not return to the Southport office. (Doc. 55-16, "In

my professional opinion, she cannot work at the Hwy 390 site due to her anxiety and the situation with coworker. She is willing to retrain and work at another site.") Plaintiff applied for three other positions with Mediacom: Commercial Account Representative in Destin, Florida; Telemarketing Representative in Des Moines, Iowa; and Direct Sales Representative in Destin, Florida. (Doc. 40-1). Plaintiff was not offered any of these jobs. Hudson's affidavit states that Plaintiff did not receive the positions because she either "(a) was not qualified or (b) was less qualified than the applicant who was selected." *Id.*

Plaintiff filed another Charge of Discrimination alleging retaliation with the EEOC in December 2011. She was not notified that she was not selected for two of the jobs until after the charge was filed. (Doc. 55-1).

In January 2012, Plaintiff learned that Defendant had openings in Gulf Breeze, Florida and Milton, Florida for the same position that she held at the Southport office. *Id.*; Doc. 55-22. On January 25, 2012, Hudson notified Plaintiff by letter that she had exhausted all of her leave and was expected to report to the Southport office by February 9, 2012, or they would consider Plaintiff to have voluntarily left employment. (Doc. 55-1). Plaintiff wrote to Hudson, repeating her counselor's opinion that she cannot return to the Southport office, and stated, "There are several positions with Mediacom I am qualified for and willing to accept. I would even consider working remotely from home." (Doc. 55-19).

Hudson responded that there was no other position available for Plaintiff. *Id.* Plaintiff resigned on February 8, 2012. (Doc. 55-20).

Plaintiff subsequently amended her Charge of Discrimination alleging retaliation to include the events from January and February 2012.

### III. ANALYSIS

*Sexual Harassment*

Plaintiff's first claim is for hostile work environment gender discrimination. To establish a hostile work environment discrimination claim under Title VII, Plaintiff must show:

> (1) that he or she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment must have been based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.

*Mendoza v. Borden, Inc.,* 195 F.3d 1238, 1245 (11th Cir. 1999). Defendant argues only that Plaintiff cannot establish the last three prongs, therefore, I will only address those.

Defendant contends that Plaintiff has not shown that the harassment was based on her sex. Plaintiff makes this argument by focusing only on the April 28th incident. However, Defendant was aware of Plaintiff's complaint of sexual harassment on March 15th when Plaintiff sent Kissam the email. Arnold alleged

9

touched her breast inappropriately *after* the email was sent. Therefore, this incident must be taken into account as well. "[W]orkplace conduct cannot be viewed in isolation, but rather is to be viewed cumulatively, and in its social context." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010).

I must accept the facts in the light most favorable to Plaintiff. *See Galvez v. Bruce*, 552 F.3d 1238, 1239 (11th Cir. 2008) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1343 n.1 (11th Cir. 2002)). Plaintiff alleged that Arnold would loiter around her counter, peer down her blouse, and made comments about Plaintiff wrapping her arms around him while riding a motorcycle. He also touched her breast inappropriately on March 15th. If April 28th events took place without the former events occurring, then it would be arguable that his asking if she was alone, moving closer to the counter, and his facial expressions were not sexual in nature. However, looking at all the events cumulatively, Plaintiff has shown enough to provide a genuine issue of material fact that the harassment was based on her gender.

Defendant also argues that Plaintiff did not establish that the alleged harassment was sufficiently severe or pervasive to alter the conditions of her employment or create an abusive work environment. Defendant agrees that

10

Plaintiff was subjectively offended by Arnold's conduct, and therefore, the Court need consider only the objective component for severity or pervasiveness.

To assess the objective component, the Eleventh Circuit has cited four factors to help determine whether the harassment was severe or pervasive: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Mendoza*, 195 F.3d at 1246. However, not all four factors must be met for conduct to be severe or pervasive. *See Freytes-Torres v. City of Sanford*, 270 Fed. Appx. 885, 890-91 (11th Cir. 2008).

> Although the Eleventh Circuit has articulated a uniform test for courts to apply in hostile work environment cases, the line between actionable conduct and non-actionable conduct is not always clear in practice. The line has been particularly elusive when the courts have been called upon to determine whether frequent, but not exceptionally egregious, conduct is sufficiently pervasive or severe to become actionable.

*E.E.O.C. v. Dillard's, Inc.*, 2009 WL 789976, at *7 (M.D. Fla. March 23, 2009). Overwhelming evidence of one factor can compensate for a lack of evidence of another factor.

In this case, Defendant does not contest the frequency of Arnold's conduct, which Plaintiff claims was almost daily. Defendant argues that Plaintiff does not meet the final three factors. The Eleventh Circuit has set a high standard for Plaintiff to meet to show that Arnold's conduct was severe or pervasive under the

11

second and third factors. *See Mendoza v. Borden, Inc.,* 195 F.3d 1238 (11th Cir. 1999); *Lockett v. Choice Hotels Int'l, Inc.,* 315 Fed. Appx. 862 (11th Cir. 2009); *Mitchell v. Pope,* 189 Fed. Appx. 911 (11th Cir. 2006). However, while the severity factor weighs in favor of Defendant, I believe that the third factor of physically threatening or humiliating conduct weighs in favor of Plaintiff. *See Reeves*, 594 F.3d at 811-13. Again, all the circumstances must be considered. Plaintiff was frequently alone in the building while Arnold constantly loitered around her work space while peering down her shirt and on one occasion touched or grabbed her breast. On April 28th, Plaintiff was so scared for her safety that she grabbed a pair of scissors to protect herself. (Doc. 55-1). As stated previously, I must accept the facts in a light most favorable to Plaintiff, and this conduct weighs this factor in her favor.

Plaintiff proffers enough evidence to create a genuine issue of material fact of whether Arnold's conduct severely interfered with her job performance. Plaintiff not only had to call and email her supervisors multiple times while working when Arnold's behavior was inappropriate, but she also locked herself in a bathroom while crying and vomiting because of his behavior. (Doc. 55-1). She moved her computer to be near the panic button and requested the kiosk be moved so that she did not have to be as close to Arnold. *Id.* Plaintiff also claims that Arnold grabbed her breast. *Id.* Additionally, Plaintiff's emotional distress, which

she says led to her fearing for her safety and caused her to lock customers out of the office, was extremely severe. *Id.* She was involved in a car accident believing that Arnold's van was approaching her. *Id.* Lastly, she was absent on leave for approximately five months while seeking help for mental health issues related to Arnold's conduct. *Id.* Even after Plaintiff was cleared to continue working, her therapist advised, "In my professional opinion, she cannot work at the Hwy 390 site due to her anxiety and the situation with coworker." (Doc. 55-16).

Defendant's argument is not true that these things "occurred well after the alleged sexual harassment by Arnold has ceased" and therefore didn't affect her job performance. Although Arnold's conduct may have ceased when he was transferred, the emotional impact of his conduct on Plaintiff did not—as evidenced by the fact that seven months after his behavior stopped, Plaintiff's therapist still recommended that she be transferred because of her anxiety about Arnold. Plaintiff argues that these negative impacts on her job performance were caused by Arnold's conduct. Given the evidence, this factor weighs heavily in Plaintiff's favor and creates a genuine issue of material fact. A jury should determine whether a reasonable person would have had such a negative job performance after Arnold's conduct.

Defendant also argues that Plaintiff cannot establish a basis for holding Defendant liable for hostile work environment discrimination. An employer will

be held liable for the sexual harassment of a co-worker only if it knew or should have known of the harassment and failed to take remedial action. *Breda v. Wolf Camera & Video,* 222 F.3d 886, 889 (11th Cir. 2000). The company has to take "immediate and appropriate corrective action." *Watson v. Blue Circle, Inc.*, 324 F.3d 1252, 1257 (11th Cir. 2003).

> [I]f a company has a clear and published policy that outlines the procedures employees must follow in reporting cases of suspected harassment, courts determining whether employer liability has been established need not delve into the internal policies of the company to determine whether the person to whom the complaints of harassment were made had the apparent authority to respond to such complaints. Furthermore, employees of such companies who believe they are victims of harassment need not be concerned with whether they pursued their complaints far enough up the company ladder. The sole inquiry when the employer has a clear and published policy is whether the complaining employee followed the procedures established in the company's policy.

*Breda*, 222 F.3d at 890.

Defendant's sexual harassment policy is that employees "should immediately report to his or her supervisor" or "should inform another supervisor" of any conduct that violates the policy. (Doc. 55-9). Plaintiff's complaints to Kissam of Arnold's behavior before March 15th never mentioned anything sexual in nature; therefore, the first time her supervisor was aware of any potential sexual harassment by Arnold was on March 15th. Arnold's behavior continued, and on April 28th, Plaintiff felt extremely physically threatened by Arnold's behavior, and she contacted the HR Department herself. The HR Department was not aware of

any previous complaints and did not take any remedial actions until after Plaintiff complained directly to them. Both Kissam and Gregg were reprimanded by Defendant for not following the company's procedures. (Doc. 55-1). Because Defendant took no remedial action for several weeks after Plaintiff's complaint of sexual harassment, Defendant failed to take "immediate" action, and therefore, can be held liable.

Given the totality of the circumstances, there are genuine issues of material fact as to whether Arnold's behavior constitutes sexual harassment to maintain a hostile work environment discrimination claim that must be resolved after a jury weighs the factors for themselves.

*Retaliation*

To establish a prima facie case of retaliation under Title VII, Plaintiff must show that : (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is some causal relation between the two events. *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1363 (11th Cir. 2007). If Plaintiff can establish a prima facie case, the burden shifts to Defendant to articulate legitimate reasons for the adverse employment action, a burden that is "exceedingly light." *Meeks v. Computer Assocs. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994). The burden would then shift back to Plaintiff to demonstrate that Defendant's proffered explanations are pretextual. *Id.*

Defendant does not dispute that Plaintiff engaged in statutorily protected activity; therefore, only the final two factors need to be addressed. Defendant first argues that Plaintiff cannot establish a retaliation claim based on constructive discharge because she voluntarily resigned.

> The "general rule is that is the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is liable for an illegal conduct involved therein as if it has formally discharged the aggrieved employee."

*Rowell v. BellSouth Corp.*, 433 F.3d 794, 802 (11th Cir. 2005)(quoting *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975)). "To prove constructive discharge, the employee must demonstrate that [her] working conditions were so intolerable that a reasonable person in their position would be compelled to resign." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1317 (11th Cir. 1989).

Although Plaintiff now tries to make the argument that she was constructively discharged, on February 8, 2012, she sent a letter to Hudson in the HR Department notifying Defendant of her voluntary resignation. (Doc. 55-20). Additionally, Plaintiff testified that she voluntarily resigned her employment with Defendant. (Doc. 44-1, p. 70). Plaintiff now argues that she was forced to resign because she "feared returning to the scene of the harassment and physical assault." (Doc. 53, p. 12). However, Arnold was transferred after Plaintiff's April 28th

complaints.[1]  With the source of Plaintiff's discomfort then gone, it is extremely hard to argue that a reasonable person would thereafter still find the work environment intolerable.  Additionally, fear of returning to work does not make the work environment intolerable.  Therefore, Plaintiff has not shown that the work environment would be intolerable, and this is fatal to Plaintiff's retaliation claim.

## IV. CONCLUSION

Therefore, Defendant's Motion for Summary Judgment is **GRANTED** as to Plaintiff's retaliation claim and **DENIED** as to Plaintiff's sexual harassment claim.

**ORDERED** on January 29, 2013.

/S/ Richard Smoak
**RICHARD SMOAK
UNITED STATES DISTRICT JUDGE**

---

[1] During Plaintiff's leave, Arnold did return back to the Southport location; however, Plaintiff seemed to learn about this only at Arnold's deposition.  Therefore, Plaintiff cannot rely on this in her argument that she was constructively discharged.